UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIAN KAUFFMAN,

              Plaintiff,

- against -

MAXIM HEALTHCARE SERVICES, INC.,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM
AND
ORDER

04-CV-2869 (TCP)

PLATT, District Judge.

        Defendant, Maxim Healthcare Services, Inc. ("Defendant" or "Maxim"), moves the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on all claims asserted by Plaintiff, Brian Kauffman ("Plaintiff" or "Kauffman"). Defendant asserts that Plaintiff has failed to state <u>prima facie</u> claims of retaliation and discrimination. For the following reasons, Defendant's motion is DENIED.

## BACKGROUND

        Plaintiff, a white male, brought this suit against his erstwhile employer, Maxim, a privately-held company that provides nurses, home health care aides and similar employees to nursing homes, hospitals, home health care agencies and the like. (Def.'s 56.1 Stmt. ¶ 1). Plaintiff alleges that Maxim terminated his employment in violation of Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 1981(a) ("Section 1981"), and the New York State Human Rights Law ("NYHRL").  Plaintiff does not claim that he suffered discrimination or retaliation based upon his own race or gender; rather, he alleges that he was terminated: (I) on account of his association with women and/or non-white employees against whom Defendant discriminated, and (ii) in retaliation for failing to participate in an alleged company policy which sought to minimize or bar the hiring of women and/or non-white employees for recruiters and more senior positions (the "Policy").

Maxim hired Plaintiff in April 1999 as a recruiter.  (Pl.'s 56.1 Stmt. ¶ 46).  Within four months of his hiring, Plaintiff was promoted to the position of senior recruiter.  (Pl.'s 56.1 Stmt. ¶ 46).  In June 2000, Plaintiff was again promoted to the position of Account Manager ("AM") and asked to open and operate Defendant's Hempstead, New York office.  (Pl.'s 56.1 Stmt. ¶ 47).  While in Hempstead, Plaintiff received a performance-based bonus of stock options and was awarded a trip to Cancun, Mexico.  (Pl.'s 56.1 Stmt. ¶ 47).  Plaintiff alleges that he ran afoul of the Policy when he hired as his first recruiter, a woman named Kristen Dassylva ("Dassylva").  (Pl.'s 56.1 Stmt. ¶ 48).  Plaintiff further alleges that he was: chastised for hiring Dassylva by his Regional Account Manager ("RAM"), Jim Miller ("Miller"), and another RAM, Duffy English ("English"); warned not to forget a previous admonition he had received that

Defendant was a "white male driven company;" and urged repeatedly by Miller and another RAM, Lee Shipman ("Shipman"), to terminate Dassylva. (Pl.'s 56.1 Stmt. ¶¶ 48-51, 58).

Plaintiff refused to terminate Dassylva[1] and in fact recommended her promotion when he was transferred in July 2001, without explanation, to Defendant's New Haven, Connecticut office, located an hour and a half away from Plaintiff's Long Island home. (Pl.'s 56.1 Stmt. ¶¶ 58-62). Once in New Haven, Plaintiff alleges that he was rebuked again for hiring another female recruiter, Julia Mastantuono ("Mastantuono"). (Pl.'s 56.1 Stmt. ¶ 63). Although Mastantuono left voluntarily for health reasons, Plaintiff alleges that he was repeatedly told to terminate her. (Pl.'s 56.1 Stmt. ¶¶ 67, 69). Similarly, Plaintiff alleges that he was rebuked for hiring Mastantuono's replacement, an African-American male named Andre Wright ("Wright"), whom Shipman admittedly referred to as "too ghetto." (Pl.'s 56.1 Stmt. ¶ 100, 105-09). Plaintiff later terminated Wright, allegedly at Shipman's insistence, on the unverified ground that Wright was seeking another job. (Pl.'s 56.1 Stmt. ¶¶ 110-11).

In July 2002, Plaintiff and his colleagues in the New Haven office

---

[1] Dassylva eventually resigned although Plaintiff disputes the voluntariness of her resignation. Plaintiff contends that Dassylva's resignation only came after relentless harassment of Dassylva concerning unrealistic financial expectations.

were rewarded for good financial performance with a dinner at Foxwoods Resort and Casino. (Pl.'s 56.1 Stmt. ¶¶ 64-65). Within a few months thereafter, in October 2002, however, Plaintiff was terminated for what Maxim viewed as the poor performance of the New Haven office. (Pl.'s 56.1 Stmt. ¶ 65). Plaintiff alleges that he was terminated for his complaints to his superiors about Defendant's illegal hiring practices and his unwillingness to engage in such practices. (Pl.'s 56.1 Stmt. ¶ 91). Plaintiff states that he was told by Shipman that his "hiring practices don't fit within the company's culture." (Pl.'s 56.1 Stmt. ¶ 113).

Following his termination, Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that he was discriminated and retaliated against when he was terminated due to his practice of hiring qualified female and minority applicants. (Bernbach Decl., Ex. 32). The EEOC determined that there was sufficient evidence to prove that Plaintiff was terminated in retaliation for his hiring practices but insufficient evidence to conclude that he was discriminated against on his race and sex. (Bernbach Decl., Ex. 32).

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment may not be granted unless the

were rewarded for good financial performance with a dinner at Foxwoods Resort and Casino. (Pl.'s 56.1 Stmt. ¶¶ 64-65). Within a few months thereafter, in October 2002, however, Plaintiff was terminated for what Maxim viewed as the poor performance of the New Haven office. (Pl.'s 56.1 Stmt. ¶ 65). Plaintiff alleges that he was terminated for his complaints to his superiors about Defendant's illegal hiring practices and his unwillingness to engage in such practices. (Pl.'s 56.1 Stmt. ¶ 91). Plaintiff states that he was told by Shipman that his "hiring practices don't fit within the company's culture." (Pl.'s 56.1 Stmt. ¶ 113).

Following his termination, Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that he was discriminated and retaliated against when he was terminated due to his practice of hiring qualified female and minority applicants. (Bernbach Decl., Ex. 32). The EEOC determined that there was sufficient evidence to prove that Plaintiff was terminated in retaliation for his hiring practices but insufficient evidence to conclude that he was discriminated against on his race and sex. (Bernbach Decl., Ex. 32).

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment may not be granted unless the

were rewarded for good financial performance with a dinner at Foxwoods Resort and Casino. (Pl.'s 56.1 Stmt. ¶¶ 64-65). Within a few months thereafter, in October 2002, however, Plaintiff was terminated for what Maxim viewed as the poor performance of the New Haven office. (Pl.'s 56.1 Stmt. ¶ 65). Plaintiff alleges that he was terminated for his complaints to his superiors about Defendant's illegal hiring practices and his unwillingness to engage in such practices. (Pl.'s 56.1 Stmt. ¶ 91). Plaintiff states that he was told by Shipman that his "hiring practices don't fit within the company's culture." (Pl.'s 56.1 Stmt. ¶ 113).

Following his termination, Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that he was discriminated and retaliated against when he was terminated due to his practice of hiring qualified female and minority applicants. (Bernbach Decl., Ex. 32). The EEOC determined that there was sufficient evidence to prove that Plaintiff was terminated in retaliation for his hiring practices but insufficient evidence to conclude that he was discriminated against on his race and sex. (Bernbach Decl., Ex. 32).

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment may not be granted unless the

were rewarded for good financial performance with a dinner at Foxwoods Resort and Casino. (Pl.'s 56.1 Stmt. ¶¶ 64-65). Within a few months thereafter, in October 2002, however, Plaintiff was terminated for what Maxim viewed as the poor performance of the New Haven office. (Pl.'s 56.1 Stmt. ¶ 65). Plaintiff alleges that he was terminated for his complaints to his superiors about Defendant's illegal hiring practices and his unwillingness to engage in such practices. (Pl.'s 56.1 Stmt. ¶ 91). Plaintiff states that he was told by Shipman that his "hiring practices don't fit within the company's culture." (Pl.'s 56.1 Stmt. ¶ 113).

Following his termination, Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that he was discriminated and retaliated against when he was terminated due to his practice of hiring qualified female and minority applicants. (Bernbach Decl., Ex. 32). The EEOC determined that there was sufficient evidence to prove that Plaintiff was terminated in retaliation for his hiring practices but insufficient evidence to conclude that he was discriminated against on his race and sex. (Bernbach Decl., Ex. 32).

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment may not be granted unless the

Court determines that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. Id. at 255; Castle Rock Entm't, Inc. v. Carol Publ'g Group, 150 F.3d 132, 137 (2d Cir. 1998). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

**II.     Standing**

Before addressing the standards applicable to Plaintiff's substantive claims of retaliation and association discrimination, the Court must first determine whether Plaintiff, as a white male, has standing to assert claims under Title VII, Section 1981, and the NYHRL. Title VII provides, in relevant part:

It shall be an unlawful employment practice for an employer . . . to

> fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). Similarly, Section 1981 is commonly used to redress racial discrimination in employment. See, e.g., Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 459 (1975). Section 1981(a) states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The NYHRL contains language similar to Title VII's prohibition on discrimination against "any person because he or she has opposed any practices forbidden under this article." McMenemy v. City of Rochester, 241 F.3d 279, n. 2 (2d Cir. 2001) (quoting N.Y. Exec. Law § 296(1)(e)).

Defendant frames Plaintiff's discrimination claim as "a non-member of a protected class" attempting to assert a claim against "members of that class." (Def.'s Mem. Sum. J. at 1). Thus, Defendant argues that Plaintiff is without standing, and in any event, such a claim is not recognized in the Second Circuit. (Id.). With respect to Plaintiff's retaliation claim, Defendant argues that Plaintiff's failure to complain to upper management or to oppose publicly

Defendant's alleged hiring practices renders his claims legally defective. (Id. at 2). Plaintiff counters that Defendant improperly characterizes his claims as vicarious claims asserted on behalf of protected class members. Plaintiff asserts that he is an injured person in that he, himself, was wrongfully discharged for his opposition to the Policy. (Pl.'s Opp. Mem. at 14-15).

Although Defendant correctly points out that the Second Circuit has not recognized as valid causes of action third-party claims of association discrimination or retaliation like those presented in the instant case, there is nevertheless a wealth of support in the prior decisions of the courts in this Circuit and our highest Court for recognizing these types of claims. Despite Defendant's urging, this Court does not conclude that the fact that the specific issues presented herein have not been squarely before the Second Circuit permits this Court to infer that the Second Circuit would decide against recognizing such claims as valid causes of action.

Indeed, many courts that have addressed claims of association discrimination and retaliation, similar to Plaintiff's claims, have concluded that the preclusion of such claims would be inconsistent with the "express Congressional intent behind Title VII and § 1981." Johnson v. Univ. of Cincinnati, 215 F.3d 561, 573-74 (6th Cir.), cert. denied, 531 U.S. 1052 (2000); see also EEOC v. St. Anne's Hosp., 664 F.2d 128, 132-33 (7th Cir. 1981);

Chandler v. Fast Lane, Inc., 868 F. Supp. 1138, 1143 (E.D. Ark. 1994). In Johnson v. University of Cincinnati, the Sixth Circuit addressed claims of association discrimination and retaliation brought by an African-American male alleging that defendants discriminated against him because of his advocacy on behalf of women and minorities. 215 F.3d at 572. The court therein reversed the district court's grant of summary judgment to defendants, holding that in order to state a cognizable Title VII claim, "the plaintiff himself need not be a member of a recognized protected class; he need only allege that he was discriminated on the basis of his association with a member of a recognized protected class." Id. at 574. In dicta, the court stated that a Caucasian individual could also assert such a claim under Title VII and Section 1981 because the protected class member status would be "imputed." Id. at 575.

Several district courts in the Second Circuit recently faced the issue of third-party claims of discrimination and retaliation but resolved the actions on other grounds. See Reiter v. Metro. Transit Auth., 2002 U.S. Dist. LEXIS 18537, at *23 (S.D.N.Y. Sept. 20, 2002) (noting that it was unnecessary to make a decision regarding third-party claims because no reasonable juror could find that the plaintiff had actually suffered retaliation); Sacay v. Research Found. of the City Univ. of N.Y., 193 F. Supp. 2d 611, 634 (E.D.N.Y. 2002) (noting that it was unnecessary to resolve third-party standing because the daughter had raised

an issue of material fact that she had engaged in protected activity in her own right). However, at least one district court in the Second Circuit has recognized a cause of action for third-party-retaliation claims. Gonzalez v. N.Y. State Dep't of Corr. Servs. Fishkill Corr. Facility, 122 F. Supp. 2d 335, 347 (N.D.N.Y. 2000) (recognizing wife's Title VII retaliation claim on account of husband's complaints of discrimination). In addition, earlier cases within this Circuit reflect the view that third-party claims of this sort are cognizable. See Whitney v. Greater New York Corp. of Seventh-Day Adventists, 401 F. Supp. 1363, 1367 (S.D.N.Y. 1975) (holding that if a white employee is discharged because her employer disapproved of a social relationship between the white woman and a black man, the employee's race is as much a factor in the decision to fire her as the race of her friend); De Matteis v. Eastman Kodak Co., 511 F.2d 306, 312 (2d Cir. 1975) (holding that "a white person who has suffered injury to some legally cognizable interest as a result of '. . . trying to vindicate the rights of [non-white] minorities . . .' has standing to sue for a violation of [Section 1981]"). Similarly, the Supreme Court has recognized the appropriateness of permitting a white plaintiff to bring a claim under Title VII alleging that he was injured by the defendant's racially discriminatory housing practices. See Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 212 (1972).

    Thus, this Court recognizes the right of Plaintiff under Title VII,

Section 1981, and the NYHRL to assert claims of retaliation and discrimination on account of his claimed opposition to Defendant's alleged policy against the hiring of non-whites and women. A broad reading of Title VII's "aggrieved person" language and the corresponding language in Section 1981 and the NYHRL is consistent with the purpose and intent of these statutes. Moreover, there is certainly a public interest in preventing the continuation of racial and gender discrimination by broadly reading such language to include these claims. Id. at 211 ("The person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is . . . the whole community . . . ." (citations and quotations omitted)).

**III.      Retaliation Claim**

In order to establish a prima facie cause of action for retaliation, the Plaintiff must demonstrate that: (1) he was engaged in a protected activity, (2) his employer knew about his involvement in the protected activity, (3) his employer took an adverse action against the Plaintiff, and (4) there is a causal nexus between the Plaintiff's participation in the protected activity and the adverse action taken by the employer. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (quoting McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001)).

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a),

provides that one may engage in protected activity either under the "opposition clause" or the "participation clause." Under the "opposition clause," a plaintiff engages in a protected activity when he or she opposes an employment practice made unlawful under the provisions of Title VII. 42 U.S.C. § 2000e-3(a); Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990) (noting that the protection of the "opposition clause" extends to an employee's acts of informal protests, such as informal complaints to management, as well as participation in formal protests). Under the "participation clause," a plaintiff engages in a protected activity by participating in a proceeding brought under Title VII. 42 U.S.C. § 2000e-3(a); Deravin v. Kerik, 335 F.3d 195, 203-04 (2d Cir. 2003).

In order for the Plaintiff to be involved in protected activity under the opposition clause, the Plaintiff must have had a "good faith, reasonable belief that the underlying employment practice [opposed to] was unlawful" under Title VII. Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 292 (2d Cir. 1998) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)). Additionally, the Plaintiff's employer must have "understood, or reasonably understood, that the Plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini, 136 F.3d at 292.

In the instant case, Plaintiff's internal complaints about the hiring practices of Defendant would fall under Title VII's opposition clause. See

Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 65 (2d Cir. 1992) (concluding that opposition to a supervisor's sexually harassing behavior via internal complaints is considered protected activity under Title VII). Defendant disputes that Plaintiff complained at all, but argues that even if he did complain, his complaints were insufficient to trigger the protection of the opposition clause because they were not directed to upper management. (Def.'s Mem. Sum. J. at 2). Contrary to Defendant's suggestion, there is no requirement that any such complaints be directed to "upper management." See EEOC Compliance Manual (CCH) P. 8006 (observing that complaining to anyone about unlawful employment practices and refusing to obey an order because the employee believes it unlawful under Title VII satisfy "opposing" conduct) (emphasis added); see also Griggs v. Duke Power Co., 401 U.S. 424, 434 (1971) (the EEOC's interpretation of Title VII is to be given "great deference" by the courts).

Accepting Plaintiff's allegations as true, the Court may not grant summary judgment on Plaintiff's retaliation claim. Plaintiff's hiring of two women and an African-American male in contravention of his employer's allegedly unlawful hiring practices as well as his complaints to his superiors about these unlawful hiring practices would certainly satisfy the first prong of a prima facie claim of retaliation, namely that he engaged in protected activity.

Moreover, although Defendant disputes the legal effect of Plaintiff's alleged complaints, there can be no serious dispute as to the second prong, at least to the extent that the Defendant was aware of Plaintiff's individual hiring practices. There is no dispute as to the third prong, as Plaintiff was terminated. Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999) (holding that the classic adverse employment actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand").

Lastly, as to the causal connection between Plaintiff's opposition and his eventual termination, Plaintiff has certainly raised an issue of material fact. Prior to Plaintiff's first hiring a woman, he was promoted on two occasions and rewarded with a trip and stock options. After his first hire, Plaintiff was transferred to the New Haven office an hour and a half away from his home. He continued to hire women and minorities and was eventually terminated. Thus, Defendant's motion for summary judgment on the retaliation claims is denied.

### IV.    Discrimination Claim

The parties are in agreement that the appropriate framework for consideration of this claim is that articulated by the Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1972). To state a claim for discrimination, a plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination. Collins v. N.Y. City Transit Auth., 305 F.3d 113, 118 (2d Cir.

2002). A plaintiff's burden in doing so is "minimal." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). A plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." McDonnell Douglas, 411 U.S. at 802; Hunter v. St. Francis Hosp., 281 F. Supp. 2d 534, 541 (E.D.N.Y. 2003) (citing St. Mary's, 509 U.S. at 507). If the Defendant can show a legitimate, nondiscriminatory reason for the termination, then in order to defeat summary judgment, Plaintiff's admissible evidence must show "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination. Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003). The legal standards for determining claims of discrimination under Section 1981 and claims of discrimination under the NYHRL are the same. Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994).

As noted above, supra III, accepting Plaintiff's allegations as true and having recognized Plaintiff's standing to assert this claim, a grant of summary judgment would be inappropriate here. With respect to the second prong of establishing a prima facie case, Defendant contests Plaintiff's assertion that he performed his job satisfactorily. Defendant argues that Plaintiff's unsatisfactory

-14-

job performance was the reason for his termination.  Although Plaintiff's office was not meeting its goals, evidence submitted by Plaintiff demonstrates that few, if any, offices consistently met the performance goals set by Defendant.  Furthermore, Defendant does not dispute that many managers performing far worse than Plaintiff were not terminated or disciplined for their failure to meet performance goals.  As the EEOC noted, Defendant's failure to follow its own "progressive discipline policy" of notifying Plaintiff of his inadequate performance weighs in favor of Plaintiff's argument that this proffered reason for his termination was simply a pretext for unlawful discrimination and retaliation. (Bernbach Decl., Ex. 32).

For these same reasons, Plaintiff has met his burden of rebutting Defendant's assertion that there was a legitimate, non-discriminatory reason for his termination.  A reasonable fact finder could certainly conclude on the record before the Court, that Defendants' proffered reason for terminating Plaintiff was merely a pretext for unlawful discrimination – or at a minimum, seriously in question, given that Plaintiff was promoted and rewarded a number of times during his employment with Defendant and was replaced with an employee of Defendant who was, by all empirical indicators, performing worse than Plaintiff.  Accordingly, Defendant's motion for summary judgment on Plaintiff's discrimination claims is also DENIED.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is DENIED in all respects.

SO ORDERED.

                                                /s/ Thomas C. Platt
                                                Thomas C. Platt, U.S.D.J.

Dated: Central Islip, New York
         July 13, 2006